**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. Equal Employment Opportunity Commission,** | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 2:20-cv-04624 |
| | : | |
| **v.** | : | Chief Judge Algenon L. Marbley |
| | : | |
| **The Ohio State University,** | : | Magistrate Judge Kimberly Jolson |
| | : | |
| Defendant. | : | |

**<u>DEFENDANT THE OHIO STATE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT</u>**

Now comes Defendant The Ohio State University and respectfully requests this Honorable Court to grant judgment in its favor as a matter of law pursuant to Fed. R. Civ. P. 56. A memorandum in support and a combined table of contents and summary of argument appears below and is incorporated herein by reference.

**Dave Yost**
**Ohio Attorney General**

/s/ Christina L. Corl
CHRISTINA L. CORL (0067869)
Plunkett Cooney
300 East Broad Street, Suite 590
Columbus, Ohio 43215
Telephone: (614) 629-3018
Facsimile: (614) 629-3019
ccorl@plunkettcooney.com
*Counsel for Defendant, The Ohio State University*

## COMBINED TABLE OF CONTENTS AND SUMMARY OF ARGUMENT

**Page**

**TABLE OF CONTENTS/SUMMARY OF ARGUMENT**                                    **i**

**TABLE OF EXHIBITS TO THIS MOTION**                                         **v**

**I.      INTRODUCTION**                                                     **1**

Plaintiff EEOC brings allegations of age discrimination against OSU based upon the elimination of Alan Knox's human resources position with OSU's College of Education and Human Ecology (EHE) following an extensive external review of operations and recommendations made by outside, independent reviewers.

**II.     UNDISPUTED FACTS**                                                 **4**

    **A.      The Relevant "Players" and the HR Structure at OSU.**            **4**

    **B.      Historical Challenges within the College of Education and Human Ecology.**                                                             **6**

        **1.      Challenges with Center for Education and Training in Employment.**                                                 **6**
This center (CETE) within the larger college (EHE) was plagued with problems for years before any final determinations were made regarding the existence and staffing of the center.

        **2.      OSU Hired Outside Experts to Assess CETE.**                   **7**
Outside experts say that CETE will cease to exist if organizational and structural changes are not made "immediately."

    **C.      Knox's Position is Abolished Based upon Recommendations of Outside, Independent Program Reviewers.**                      **8**

    **D.      The Work Previously Performed by Knox was Absorbed by Two Existing Employees of the Same Rank, Title and Age Class as Knox.**                                                           **11**
Fifty percent of Knox's prior work was assigned to Jodi Renshaw, age 49, and fifty percent of Knox's prior work was assigned to Jackie Chambers, age 50.

    **E.      Months After Knox's RIF Unrelated Organizational Changes Prompt More Position Changes.**                              **13**

EHE got a new Dean, a new Director of Human Resources and the resulting position vacancies resulted in reclassification of several employees.

**F.     Jennifer Lagnese was Transferred to an HR Generalist Position Because of the Promotion of Jackie Chambers to Co-Director of HR.                                                              14**
Knox complains that it was age discrimination to transfer Jennifer Lagnese (age 28) to assume a few of his former job responsibilities 6 months after his RIF and immediately following the promotion of Jackie Chambers. The evidence, however, refutes Knox's claims.

**G.     Knox Unsuccessfully Applies for Multiple Positions                    15
University-Wide and Claims Discrimination when he is not Hired.**
OSU has provided legitimate, non-discriminatory reasons for hiring applicants other than Knox for various positions, many of which were filled with hires in the same age class as Knox.

**H.     With the Help of the "Bad Actor" Bryan Lenzo, Knox is Hired for the "Best Job of His Life" Working at the Same Company as Lenzo, Who Knox Claims Engaged in Age Discrimination by Deciding Knox's Position at EHE would be Eliminated.                          17**

**I.     Knox Files an HR Complaint with OSU 6 Months After the RIF.     19**
After conducting an investigation into his allegations, OSU finds that Knox's complaints of alleged age discrimination are unfounded.

**J.     Knox Files a Charge of Discrimination with EEOC.                    20**
Knox makes outrageous claims in his EEOC complaint which he is later forced to admit are untrue and based upon his own speculation and assumptions.

**III.    LAW AND ARGUMENT                                                           22**

**A.     Plaintiff's Claims Under the Age Discrimination in Employment Act.**
To maintain a claim of age discrimination, a plaintiff must present some credible evidence, either direct or circumstantial, that age was the but-for cause of his termination.  *Gross v. FBL Fin. Servs. Inc.,* 557 U.S. 167 (2009). Plaintiff has not provided any direct evidence of age discrimination.   However, Plaintiff will presumably assert that it can establish a *prima facie* case of age discrimination under the *McDonnell Douglas* burden-shifting analysis.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Following *Gross,* the Sixth Circuit explained that the *McDonnell Douglas* framework remains useful in analyzing circumstantial evidence in ADEA

claims. *Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir. 2009). To state a *prima facie* case, a plaintiff must establish that: 1) he was a member of a protected class; 2) he was discharged; 3) he was qualified for the position held; and 4) he was replaced by someone outside of the protected class. *McDonnell Douglas,* 411 U.S. at 802. In the context of a reduction in force, the fourth requirement is modified to require the plaintiff to offer some "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Thompson v. Fresh Products, LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citing *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414 (6th Cir. 1999)). **23**

> **B.** **Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination.**

Because Plaintiff's job duties were assumed after the RIF by two existing employees of the same rank, title and age class as Plaintiff, his claims fail without any further analysis. **25**

> **C.** **Knox's RIF was Based Upon Legitimate, Non-Discriminatory Reasons.** **27**

It is undisputed that the elimination of Knox's position occurred as a result of a reorganization which was prompted by an outside program review which cost the University approximately $123,000. Knox has presented no evidence of age discrimination.

> **D.** **EEOC Cannot Demonstrate that OSU's Proffered Explanation is a Pretext for Unlawful Age Discrimination.** **29**

To establish that an employer's legitimate, nondiscriminatory reason for an adverse employment action is pretextual, a plaintiff may show that: "(1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his [termination], or (3) they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009) (quoting *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir. 1993)). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently cause [the] employer to take the action it did) are not true.'" *Smith v. Chrysler Corp.,* 155 F.3d 799, 805–06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 676 (7th Cir. 1997)). "[A] reason cannot be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)).

**E.      The Reclassification of Jennifer Lagnese was not the Product of Age Discrimination Nor was it Related to Knox's RIF.                    32**

Jennifer Lagnese taking over a few of Knox's prior job duties 6 months after his RIF was related to unanticipated organizational changes, including the appointment of a new Dean of EHE and the resignation of EHE's Director of Human Resources, and was not motivated by age discrimination.

**F.      There is no Direct Evidence of Age Animus in EHE.                    37**

In an attempt to gin up some sort of direct "evidence" of age discrimination related to Knox, Plaintiff in its Complaint claims that Knox and Renshaw were referred to by Lenzo in age discriminatory terms such as "old guy," "old girl" and collectively as the "old crew."  (Complaint, ECF #1, ¶ 7.h.i). The Sixth Circuit recently examined a very similar case and held that referring to an older employee as having a "limited shelf life" and reaching her "expiration date" was not direct evidence of age discrimination and was insufficient to create a question of fact on summary judgment. *Pelcha v. MW Bancorp.,* 988 F. 3d 318, 325-26 (6th Cir. 2021).  The Court held that simply referring to an employee's length of service or nearing retirement "can refer to how long an employee has spent at a company, not simply their age" and is not sufficient to demonstrate age discrimination.  Id. at 325.

**G.      There is no Evidence that Knox's Failure to be Hired for Another Position at EHE was Based upon Age Animus.                    38**

For the entirety of this case, and pre-suit, EEOC pursued failure-to-hire claims related to 8 other positions for which Knox applied all over campus at OSU in the years following his RIF.  On the eve of summary judgment, EEOC claims to be withdrawing 7 of its 8 claims of discriminatory failure to hire.  The alleged failure to hire on the basis of age discrimination is analyzed under the same *McDonnel Douglas* framework.  *See*, *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (relying on *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973)). There is no evidence of age discrimination for the only remaining claim being advanced by EEOC.

**IV.   Relief Requested.                    40**

Plaintiff's claims must be dismissed in their entirety.

## **EXHIBITS TO THIS MOTION**

01/14/2022 Email from EEOC counsel Maria Morroco       A

Jennifer Lagnese Deposition Excerpts       B

Bryan Lenzo Deposition Excerpts       C

Dr. Cheryl Achterberg Deposition Excerpts       D

Outside Program Review & Related Addendum       E

Affidavit of Kristi Hoge       F

Alan Knox Deposition Excerpts       G

RIF Request Director of CETE (Mahlman)       H

01/16/18 Letter to Robert Mahlman (RIF)       I

Hoge Personal Deposition Excerpts       J

Knox RIF Request       K

Jackie Chambers Deposition Experpts       L

04/16/18 Notice to Lagnese re: Senior HR Specialist       M

10/15/18 Notice to Lagnese re: HR Generalist       N

Kristi Hoge 30(b)(6) Deposition Excerpts       O

Beth Brengartner Deposition Excerpts       P

OSU Responses to Plaintiff's First Set of Interrogatories       Q

Adam Daniels Deposition Excerpts       R

EEOC 3271 and EEOC 3303       S

EEOC 3429       T

10/13/18 Email Complaint of Knox to OSU       U

01/25/19 OSU Case Report re Complaint of Knox       V

Knox EEOC Charge       W

## I.     INTRODUCTION

This baseless lawsuit alleging age discrimination was filed following a reduction in workforce ("RIF") at the Ohio State University ("OSU"), within its College of Education and Human Ecology ("EHE" or the "College") that eliminated the human resources position of Alan Knox – the complaining party.  Despite Knox's claims of age discrimination, the reality is that the RIF was the product of *years* of internal discussion and analysis related to various "centers" located within EHE.[1]  The College spent over $123,000 retaining outside experts to review the organizational structure of EHE and its centers.  The outside experts recommended that one center for which Knox provided human resources support, the Center for Education and Training in Employment ("CETE"), be merged into the larger College program.  The outside experts frankly advised that CETE was on the brink of death: "We believe it is quite likely that CETE will cease to exist without implementing changes in vision and operation."  In response, OSU adopted the recommendations of these outside experts and merged CETE into another center called Educational Studies.

Because of this merger, the Human Resources Generalist who supported CETE, namely, Knox, would no longer be necessary and OSU abolished Knox's position.  *His duties were absorbed by two existing employees of the same rank, title, and age-class*.  What followed was a parade of baseless allegations of age discrimination first by Knox and then by Plaintiff, the Equal Employment Opportunity Commission (the "EEOC").  Indeed, and frankly shockingly, when Knox was deposed, he admitted that he has no evidence that OSU's decisions related to the RIF, or Knox's subsequent attempts to gain re-employment with OSU,

---

[1]  "Centers" within EHE are simply independently-run programs which are housed within the College.

1

were based upon age discrimination or age animus. Because Knox inexplicably filed a Charge with the EEOC, the EEOC has blindly parroted these "facts," yet cannot support any of its claims.

Even more troubling than the EEOC's blind devotion to the untrue allegations in its Complaint, the purported age-biased "villain" who was the "mastermind" of Knox's illegal RIF, Bryan Lenzo, then-director of Human Resources within EHE, *left OSU and then sought out Knox to apply for a position at Lenzo's new employer*. According to Knox, he is now working at the "best job" "in his life" – with Lenzo – where he earns significantly more money than he did at OSU. Lenzo and Knox have now worked together at the new employer for several years.

Knox and the EEOC also take issue with the subsequent (six months later) reclassification of an employee (Jennifer Lagnese) who eventually took on *some* of Knox's former duties and, also, OSU's failure to hire Knox for positions for which he applied throughout the University after the RIF. The evidence, however, is clear that the reclassification of Jennifer Lagnese into the position of Human Resources Generalist (a title that Knox held prior to the RIF, along with multiple other Human Resources Generalists within EHE) was not age-based. Instead, it was prompted by multiple factors: i) the retirement of the Dean of EHE; ii) the appointment of a new Dean of EHE that sought to decentralize human resources within EHE; iii) the resignation of the Director of Human Resources within EHE; and iv) the promotion of two of Knox's former peers into the roles of Interim Co-Directors of Human Resources within EHE. Further, the decision makers who laterally reclassified Lagnese were **not** the same decision makers that instituted the RIF – in

fact, Bryan Lenzo, the sole decision maker for the RIF, had no involvement in the reclassification of Lagnese.

Knox also admits that he has no evidence that there was age discrimination in the multiple decisions that were made regarding his (8) subsequent OSU job applications. He admitted that he did not know any of the decision makers, except one, and knew very few of the candidates that he was competing against for those positions. Of the few that he knew, he admitted they were qualified candidates. Knox's inability to gain reemployment with OSU was significantly impacted by his inappropriate interview comments and the information he provided related to these applications. For example, one decision maker found Knox's application to be "contradictory" and a "big red flag," while another hiring committee recalled a previous interview with Knox where "[h]e came across to the committee as arrogant, inflexible and flippant regarding the committee's questions. He projected that he knew everything and could do everything even without considering the unique circumstances that the committee posed. *He also made a smart remark talking about only wanting to be employed by OSU so he could get his football tickets, which was a very inappropriate statement for this interview*."

The EEOC has now abruptly changed its position related to the failure to re-hire portion of the Complaint. Despite the EEOC pursuing a claim for over 3 years that the entire University was engaged in a far-flung conspiracy against older workers including Knox, as of January 14, 2022, the EEOC has withdrawn 7 of its 8 failure to hire claims – one week before the deadline to file dispositive motions. (Ex. A, 1/14/22 Email from Maria Morocco, counsel for the EEOC). This is but another example of the EEOC and Knox refusing to withdraw claims even after being provided with documentary and other irrefutable evidence which

demonstrates that their claims are baseless, even bordering on frivolous.  For instance, the EEOC continued to pursue 4 failure to hire claims against the University for years after being provided irrefutable facts demonstrating that the workers who were hired instead of Knox were in the same age class, and some even older than, Knox.  The EEOC was provided this information pre-suit yet filed suit and pursued costly discovery on these frivolous claims, only to informally withdraw[2] them on the eve of summary judgment.

In summary, for Plaintiff's allegations to be true, the Court would need to find that there was a University-wide illegal conspiracy against Knox – made up of dozens of individuals – many of whom do not even know each other – who have all sought to discriminate against Knox because of his age.  Not only do the facts not support this narrative, the facts demonstrate the OSU consistently and regularly hires and promotes those in Knox's age class.  Moreover, the "bad actor" who allegedly improperly terminated Knox for age discrimination repeatedly assisted Knox with his post-OSU job search and ultimately tracked him down and solicited Knox to apply for a position (at a company at which the "bad actor" also works) which Knox refers to as the "best job" of his life.

For the reasons set forth more fully below, Plaintiff's Complaint fails and summary judgment should be granted in OSU's favor.

## II. UNDISPUTED FACTS

### A. The Relevant "Players" and the HR Structure at OSU.

At the outset, it is helpful to understand the names and roles of the players involved in this lawsuit as positions have changed over time and many are now former employees.  A brief overview is provided here as a point of reference:

---

[2] To date, no formal withdrawal of this portion of the EEOC's claims has been proffered.

- <u>Dr. Cheryl Achterberg</u>, Dean of the College of Education and Human Ecology (EHE) (2008-June 30, 2018) is no longer with OSU.

- <u>Dr. Don Pope-Davis</u>, Dean of EHE (July 1, 2018-present) is the current Dean.

- <u>Bryan Lenzo</u>, Human Resources Director within the EHE (2013-2019) is no longer with OSU.

- <u>Jacqulyn (Jackie) Chambers</u>, Human Resources Generalist within EHE (2006-October 11, 2018), was promoted to Interim Co-Director of Human Resources within EHE (October 11, 2018-March 2020) following Knox's job abolishment and is currently an OSU employee.

- <u>Adam Daniels</u>, Human Resources Generalist within EHE, then promoted to Interim Co-Director of Human Resources within EHE (October 11, 2018-September 2019) is no longer with OSU.

- <u>Joan (Jodi) Renshaw</u>, Human Resources Generalist within EHE (2007 to present) is currently an OSU employee.

- <u>Alan (Al) Knox</u>, Human Resources Generalist within EHE (January 2006-March 30, 2018) is the complaining party.

- <u>Jennifer Lagnese</u>, Human Resources Specialist within EHE (July 2017-April 16, 2018), then received a title change to Senior Human Resources Specialist (April 16, 2018-October 8, 2018), then laterally reclassified to Human Resources Generalist within EHE (October 8, 2018-2021) and is no longer with OSU.

- <u>Kristi Hoge</u>, Manager of Employee Relations (2017-March 2019), then Associate Director of Employee and Labor Relations (March 2019-present) and 30(b)(6) witness/deponent is currently an OSU employee.

Knox, prior to the RIF, was employed as a Human Resources Generalist, providing internal human resources support to three centers within CEHE – CETE, SFC and CCEC. There is a distinction between a Human Resources Specialist ("HR Specialist") and a Human Resources Generalist ("HR Generalist"). An HR Specialist plays a supporting role to an HR Generalist. The role of HR Specialist is much more transactional and procedural in nature

acting in support of the HR Generalists who generally handle strategy, client interfacing, and broader human resources objectives.  (*See*, *e.g.*, Ex. B, Lagnese Depo., Pgs. 18-19). [3]

**B.     The Historical Challenges Faced within the College of Education and Human Ecology (EHE) and, Particularly, within the Center for Education and Training for Employment (CETE).**

Within the College of Education and Human Ecology ("EHE"), there were four centers that are central to this lawsuit: the Shoenbaum Family Center ("SFC"), the Crane Center for Early Childhood ("CCEC"), the Center on Education and Training for Employment ("CETE"), and Educational Studies ("Ed Studies").[4]  In the years that led up to the reduction in force that is the focus of this lawsuit, EHE grappled with internal challenges including how to structure or restructure the centers – some of which were determined to not be viable.

**1.  Challenges with CETE Persisted for Years.**

Discussions and analysis of the various centers within EHE and whether certain centers could survive had been ongoing for years.  Bryan Lenzo, the HR Director within EHE (from March 2014 until mid-2018) testified about these challenges:

> But there were ongoing conversations about CETE, its structure, how it should be led, what administrative support should look like, from -- almost from the day that I started at the college [2014]. I think it was a -- a conversation that had been occurring for quite some time.  (Ex. C, Lenzo Depo., Pg. 62).
>
> * * * *
>
> So I think, to sort of set the – the history a little bit, it's my understanding, prior to me joining the college, that the centers, as they were known, was a group of several centers that had, you know -- my understanding is around 100 employees, if not more. And that over the many years, as outside funding and grants and soft money opportunity dried up -- by the way, those centers were completely funded by soft money. So they didn't receive any university regular

---

[3]  All deposition transcripts and exhibits have been filed in their entirety with the Clerk of Courts.  Cited portions are attached as exhibits hereto.

[4] The abbreviations used here for EHE, SFC, CCEC, and CETE were and are commonly used at OSU.

funds. Right? So had to be self-sufficient. So over the years, as those funds shrank, the centers got smaller and smaller and smaller. So that occurred over time. Right? And so these assessments are taking place. These conversations are taking place. How do we change the organization to keep it thriving or healthy or a part of the college. And so decisions were made along that road, right, all the way up until the end, where I believe there were less than 40 full-time associates in the center.  (Id., Pgs. 46-47).

### 2.  OSU Hired Outside Experts to Analyze the Challenges at CETE.

As a part of these analyses and discussions, in 2016, OSU hired two outside experts, one from the University of Illinois and the other from the University of Georgia (the "Outside Experts"), to study and assess EHE, with particular focus on CETE.  (Lenzo Depo., Pgs. 63). Dr. Cheryl Achterberg, Dean of EHE (from 2008 to June 30, 2018), confirmed these challenges faced by EHE and her role of reorganizing EHE.  (Ex. D, Achterberg Depo., Pg. 73) ("I was hired to do mergers"); and Pg. 23 ("There was a reorganization under way as requested by the provost.").

These Outside Experts reviewed two centers within EHE, CETE and Workforce Development in Education,[5] and, in late 2016, issued a robust report and related addendum (collectively, the "Program Review Report").  (Ex. E, Program Review Report and related Addendum from Outside Experts).  The opinions of the Outside Experts were stark and rather dire:

> . . . . it is also clear to us that changes are necessary and that *business as usual* is not a viable strategy in the emerging model of land grant universities in the 21 century.  Indeed it is apparent that these two units are approaching (or may have already arrived at) a crossroad that requires serious decisions by faculty and staff...we believe it is unlikely that this goal can be attained without substantial repositioning of unit goals, staffing, and practice.  (Emphasis in original).  (Id., at Pg. 1).

* * *

---

[5] While CETE is part of the central focus of this lawsuit, the Workforce Development in Education center is not.

Changes in thinking about the role and contributions of CETE within EHE are essential for the long-term sustainability of CETE activities.  (Id., at Pg. 5).

* * *

While our assessment is certainly debatable, **we believe it is quite likely that CETE will cease to exist without implementing changes in vision and operation**.  (Emphasis added).  (Id.)

Given the challenges facing CETE, the Outside Experts recommended that OSU: "1.  Appoint a faculty member as CETE Director . . . 2. Reconstitute CETE organization and operational structure to reflect EHE expectations for center operation."  (Id., at Pg. 6).  OSU paid $123,143.76 for the Outside Experts and the Program Review Report.  (Ex. F, Affidavit of Kristi Hoge (OSU's 30(b)(6) witness)).

### 3. OSU Adopted the Outside Experts' Program Review Report and Decided to Reorganize CETE by Merging It into Ed Studies.

OSU acted upon the recommendations of the Outside Experts and began reorganizing EHE, which ultimately led to the merger of CETE into Ed Studies in February 2018. (Achterberg Depo., Pgs. 92, 46).  Knox admitted that he knew nothing about the Outside Experts or their recommendations.  (Exhibit G, Knox Depo., Pgs. 60-61) ("No. Why would I be aware of the dean's asking for a study?")).[6]

### C. The Director of CETE and the HR Generalist supporting CETE, Knox's Position, Were Abolished Through Two Reductions in Force Based upon Legitimate, Non-Discriminatory Business Reasons.

Not surprisingly, the merger of CETE into Ed Studies led to some redundancies – which directly resulted in positions being abolished through separate reductions in force ("RIF").[7]

---

[6] Nonetheless, Knox should not have been surprised by a merger of CETE as he had lived through numerous mergers in the past which include multiple centers that he previously supported as an HR Generalist.  (Knox Depo., Pgs. 22-24, 26).

[7] It should be noted that there has been some confusion regarding the requests for information received by OSU from the EEOC during the EEOC's pre-suit administrative

First, and perhaps most obvious, was the RIF of the position of Director of CETE which had been occupied by Robert Mahlman.  The RIF of the position of Director of CETE was authorized in late-December 2017/early January 2018 and notice was provided to Mahlman on January 16, 2018.  (Exs. H and I, Request for Reduction in Work Force for Director of CETE (the "Director RIF") and Letter to Mahlman, respectively).  The request for approval of the RIF clearly states that the RIF was based upon the Program Review Report of CETE and for efficiency. (Id.; Ex. J, Hoge Personal[8] Depo., Pg. 73).

Second, the merger of CETE into Ed Studies also directly resulted in a second RIF of the CETE HR Generalist position which was held by Knox.  As discussed below, Ed Studies was already supported by another HR Generalist such that a second HR Generalist was not necessary.  The RIF of Knox was authorized in March 2018.  (Ex. K, Request for Reduction in Work Force for HR Generalist (the "HR Generalist RIF")).  The HR Generalist RIF states that the RIF was based upon the Program Review Report of CETE:

> The Center on Education and Training for Employment (CETE) is under an [sic] reorganization from recommendations received by a program review. This center has been merged with the Department of Educational Studies therefore eliminating the need for the above position.  (Id.)

---

complaint/investigation process.  The EEOC asked for information regarding other employees terminated in the "same" RIF as Knox.  OSU misunderstood the request and, in the administrative investigation process which occurred pre-suit, provided information regarding other employees such as Robert Mahlman, Neal Kelley and Tian Bing, whose unrelated job positions were also eliminated as a result of the reorganization at EHE during 2018.  Although the position eliminations for those other employees are tangentially related to Knox, they were not, in fact, part of the "same" RIF as Knox so the pre-suit information provided on these other employees was in error.  This fact has no relevance to the claims being made by Plaintiff/Knox here, but the EEOC may claim OSU has provided "shifting explanations" regarding Knox's RIF, which is simply untrue.

[8] Kristi Hoge was deposed twice in this case, once in her personal capacity related to her role as investigator for Knox's complaint of age discrimination within OSU and a then also as OSU's Rule 30(b)(6) witness.

The HR Generalist RIF request also confirmed that the RIF was a "reorganization for efficiency." (Id.)

Simply, OSU adopted and carried out the recommendations of the Outside Experts and merged CETE into Ed Studies.  As such, the RIF of the HR Generalist position that supported CETE was based upon a legitimate, non-discriminatory business reason.  Dean Achterberg confirmed that the RIF of Knox's position was based upon the CETE reorganization.  (Achterberg Depo., Pgs. 55, 91-92).  HR Director of EHE, Bryan Lenzo, similarly testified:

> So I think Bob Mahlman's position was eliminated as a part of those conversations. Other organizational changes were made. A faculty was hired into a director role.  As a part of that assessment, the committee looked at how many FTEs [full time employees] were in every business unit at the college, how many transactions were being supported by every HR professional at the college. **It also discussed that Educational Studies had a HR support person in place, and so there would be duplication, in a manner of speaking, in that regard**.

> And I think after, it was determined that generalists would assume responsibilities for CETE, given all the factors that we discussed. When you looked at all that was left was responsibility for SFC, it did not appear to the committee that there was enough work to support the position. (Emphasis added).  (Lenzo Depo., Pgs. 104-105).

Bryan Lenzo authorized the RIF of the HR Generalist position.  (Ex. K, HR Generalist RIF).  While, as matter of course, the HR Generalist RIF paperwork was also signed by Dean Achterberg and a representative OSU's Office of Human Resources, *it is undisputed that the decision for the RIF was made by Bryan Lenzo alone.*  Dean Achterberg confirmed that her role was at a much higher level and that termination decisions are made by direct supervisors. (Achterberg Depo., Pgs. 52-53, 105).  Bryan Lenzo similarly testified and confirmed the RIF was not dictated to him by anyone.  (Lenzo Depo. Pg. 157).

10

**D.**    **The Work that Knox Performed Before the RIF was Absorbed by Two Existing Female HR Generalists, Both of Whom were Well Over 40 Years Old.**

At the time of the HR Generalist RIF, Knox was servicing only three centers within EHE: SFC, CCEC, and CETE.  (Knox Depo., Pgs. 28-29).  At this time, 50 percent of Knox's work related to supporting CETE and the other 50 percent related to supporting CCEC and SFC. With the abolishment of the HR Generalist position held by Knox, two other HR Generalists, Jodi Renshaw and Jackie Chambers, absorbed the work previously performed by Knox. (Knox Depo., 93-95, 99).  Both Renshaw and Chambers were well over 40 years old at that time (Renshaw was 49 and Chambers was 50 years old).  (Id.)

As mentioned above, HR Specialists occupy a supporting role to the HR Generalists, performing more transactional duties that directly support the work of HR Generalists. (Lenzo Depo., Pg. 166.)  ("So a specialist was more aligned to support the tactical day-to-day transactional work. And a generalist was doing more HR business partner responsibilities, a more senior level role."))  Jennifer Lagnese was an HR Specialist at the time of Knox's RIF, who was supporting Knox's HR Generalists position with CCEC and SFC.  When Chambers absorbed the HR Generalist coverage of CCEC and SFC following Knox's RIF, Lagnese supported Chambers – thereby continuing her support and relationship with CCEC and SFC just as she had done with Knox.  This was confirmed by both Bryan Lenzo and Jackie Chambers:

> Q. Does that mean that Lagnese was performing Knox's duties with respect to SFC and CCEC?
>
> A. **So, no.** What was supposed to happen was Jodi Renshaw was assuming the responsibility for CETE. Jackie Severance [a/k/a Chambers] was the lead on the SFC, CCEC. And Jennifer Lagnese would function as a support, or number two person, for any additional -- any additional runoff, because Jackie may

occasionally be busy with other responsibilities. But Jackie was in the lead role, the number one spot, there. (Emphasis added). (Lenzo Depo., Pgs. 139-140).

\* \* \* \*

Q. After Al Knox was terminated, did Jennifer [Lagnese] then go on to handle the SFC/CCEC HR requests?

A. She supported me in handling those requests.

Q. Okay. And what do you mean by that?

A. Jennifer Lagnese used to support Al [Knox] in HR requests. That's an HR Specialist's job is to support the HR Generalist, and so that is what Jennifer Lagnese was doing for me.  (Chambers Depo., Pgs. 94-95).

As discussed further below, Knox baldly alleges that Jennifer Lagnese replaced him or otherwise took on his duties.  Both of these allegations are wholly unsupported by the undisputed evidence.  (Chambers Depo., Pgs. 113-114) (Lagnese wasn't given any new work in SFC/CCEC after Knox's termination).  As noted above, Knox has no basis to dispute the division of his work after the abolishment of his position.

Finally, while the testimony is clear that Lagnese did not absorb or take on any of Knox's former duties, Plaintiff persists in attempting to assert that Lagnese's role is somehow indicative of age discrimination against Knox.  On April 16, 2018, OSU issued notice to Lagnese of a change in job title from HR Specialist to Senior HR Specialist related to "significant duties and responsibilities [that] have been added to your position" with a small pay increase.  (Ex. M, 4/16/18 Notice to Lagnese).  The pay increase, however, meant that Lagnese "will not be eligible for the Annual Merit Compensation Process, which will be effective September 1, 2018."  (Id.)  The basis for the title change was *not* because Lagnese took on any of Knox's duties, it was because of Lagnese's project management duties (which were part of Lagnese's role at OSU).  (Hoge Personal Depo., Pgs. 150-152) (Lagnese's title change "was because of the projects that she was doing, and that she was absorbing -- not

12

Al's duties, but she was doing additional responsibilities, most notably, project management and background check and issues like -- that supported the overall function of the generalist of EHE.").

> **E.** **In the Months Following the RIF, Numerous Organizational Changes Occurred in EHE Wholly Transforming Decisional Authority.**

In the six months immediately following the RIF of Knox's position, numerous organizational and employee changes took place which wholly transformed the decisional authority within EHE. These changes did not relate to the merger of CETE or Knox's RIF and they were not foreseeable at the time of the RIF.

First, approximately two months after Knox's RIF, Dr. Achterberg, Dean of EHE, retired on June 30, 2018 due to a host of family issues. (Achterberg Depo., Pg. 84, 146). Second, on July 15, 2018 a new dean was appointed to the college of EHE – Dr. Don Pope-Davis. Critically, Dean Pope-Davis took an opposite approach to the functioning and organization of human resources within EHE – he wanted to decentralize human resources: "The dean, the new dean [Dr. Pope-Davis], had made the decision to decentralize the unit HR organization." (Hoge Personal Depo., Pg. 146).

Third, in October 2018 Bryan Lenzo, HR Director, took on a new role in EHE and, ultimately, Lenzo accepted another job outside of OSU and resigned effective January 11, 2019. Fourth, on October 11, 2018, after Lenzo left the role of HR Director within EHE, Adam Daniels and Jackie Chambers were internally promoted to the roles of Interim Co-Directors of HR within EHE. (Chambers Depo., Pg. 127; Ex. R, Daniels Depo., Pg. 22). The combination of the retirement of Dr. Achterberg, the appointment of Dean Pope-Davis, and the reassignment/resignation of Bryan Lenzo completely changed the direction of human resources within EHE. By October 2018, only six months after the RIF of Knox's HR

Generalist position, the HR structure within EHE had significantly changed.  Critically, the sole decision maker for the RIF of Knox's position, Bryan Lenzo, no longer had decisional authority in EHE or at OSU nor did he participate in any decision making during this time.

**F.    Jennifer Lagnese's Reclassification to HR Generalist Was Prompted by Jackie Chamber's Promotion to Interim Co-Director of HR.**

At the time of the RIF of Knox's position, he was providing human resources support to CETE, CCEC, and SFC.  Following the RIF, Renshaw absorbed CETE and Chambers absorbed CCEC and SFC.  Jennifer Lagnese, an HR Specialist, supported Knox and his coverage of CCEC and SFC prior to the RIF.  Following the RIF, Lagnese continued to support CCEC and SFC, except now she was supporting Jackie Chambers, the HR Generalist who absorbed that half of Knox's duties.

In October 2018, Jennifer Lagnese was reclassified (essentially a promotion) to HR Generalist as a result of the significant structural changes at EHE, most significantly because of Jackie Chambers' promotion to Interim Co-Director of HR within EHE.  (Ex. N, 10/15/18 Notice regarding reclassification).  Jackie Chambers testified about this transition:

> Jennifer Lagnese was promoted to HR Generalist in October of 2018 because I had become a co-director with Adam Daniels and could not handle all the volume that I had. So it was a decision made with Adam Daniels and myself, along with the Dean [Pope-Davis], to move her into an HR Generalist position to take on SFC/CCEC.  (Chambers Depo., Pg. 127).

Consistent with Dean Pope-Davis's efforts to decentralize human resources within EHE, once Jennifer Lagnese's position was reclassified to HR Generalist, she was reporting directly to Dr. Laura Justice, Director of SFC – rather than reporting to the Interim Co-Directors of HR.  (10/15/18 Notice regarding reclassification)("Your supervisor will be Dr. Laura Justice.").

The decision makers for Lagnese's reclassification were Dean Pope-Davis, Jackie Chambers, and Adam Daniels – none of whom were decision makers for the RIF of Knox's HR

Generalist position.  Indeed, Dean Pope-Davis was not even employed by the College of EHE at the time of the RIF.  Moreover, as discussed above, there were numerous organizational changes that drove the reclassification of Lagnese's position to HR Generalist:

> Q. Do you think that Jennifer Lagnese's reclassification into an HR generalist position had any bearing on whether Alan Knox's separation from the university may or may not have been because of age discrimination?

> A. At the time of the reclassification, into the HR generalist role, the staffing levels of the HR organization and EHE were different. There were multiple factors, which included the leadership changing, Jackie Chambers's role changing, a  resignation and a medical leave that presented a different set of workload circumstances, at the time of that reclassification, than what were present at the time of the reduction in force. (Hoge Personal Depo., Pgs. 51-52).

### G.      Knox Unsuccessfully Applied for Positions at OSU, but His Lack of Success Cannot be Attributed to Age Discrimination.

Following the RIF of Knox's position, he applied for 8 positions at OSU (across the University) including one HR job within EHE. Discovery in this case addressed each of these positions and, most glaringly, that Knox does not have any evidence that his failure to advance with these applications was based upon age discrimination or animus.  Importantly, for 7 out of 8 of these positions, the decision makers were people or committees in other divisions of the college and even in different cities outside of Columbus.  Further, Bryan Lenzo, the sole decision maker that mandated the RIF of Knox's position, was not involved in *any* of these decisions.  Moreover, three of these positions were filled by candidates who were more than 40 years old and in the same age class as Knox.  One posting for multiple positions was expressly limited to *current OSU employees only* because of a COVID-based external hiring freeze.  Further, Knox was unsuccessful with two of the applications because of his previous, frankly troublesome, comments made while interviewing before the same committee(s) a few years earlier.  In those previous interviews he told the hiring

committee(s) that he only sought to be employed at OSU "for his football tickets." (Ex O, Hoge Rule 30(b)(6) Depo., Pgs. 27-28).   Knox was unsuccessful with another position based upon a "big red flag" in his "contradictory" application.  (Ex. P, Brengartner Depo., Pgs. 43-44).

On January 14, 2022, one week before this motion was due, EEOC contacted OSU stating that it will "not pursue" its failure to re-hire claims for 7 out of 8 of these positions. (Ex. A, Morocco email).  Frustratingly, EEOC had been provided with all the necessary information and documentation to assess these very claims *pre-suit*, yet it chose to file suit on the claims and pursue extremely costly discovery on them only to withdraw the claims literally on the eve of the dispositive motion deadline.  Further, although Plaintiff stated it will "not pursue" its claim for 7 of the 8 positions, it has not formally withdrawn the claims or otherwise formally conceded.  If Plaintiff fails to confirm to the Court in its memo contra MSJ that it is, in fact, not pursuing these claims, OSU reserves the right to request supplemental briefing on these claims in its reply brief.

This leaves one position at issue where OSU allegedly discriminated against Knox by failing to hire him.  This was an HR Generalist position within EHE (Position 445794) which was filled by Teri Parsell, who was 37 years old at the time.  OSU explained its hiring rationale:

> Ms. Parsell was employed at OSU and had extensive experience working with faculty, a complete grasp of the HR Transaction universe at OSU and was a leader in terms of implementation of new technology. The size of her HR 'customer group' has been comparable as well at times in her career.  Ms. Parsell's interview responses and experience made her best suited to deal with a difficult customer group consisting of faculty and to be better suited to deal with potential conflict situations.  (Ex. Q, OSU's Responses to Plaintiff's First Interrogatories, Pg. 5).
>
> * * * *
>
> So -- and then if you look at the other candidates, HS [Human Sciences] is a high-transaction entity, and they have all sorts of HRAs. Teri [successful candidate, Teri Parsell], for example, had seen both sides of the equation,

> which is, again, very unique from my perspective. It made her far and above more qualified for the role than Al [Knox], and that's why she would, at the very least -- and I believe there were other candidates, forgive me, I don't remember them, but her and I believe at least another candidate would have -- would have -- would have gone forward. (Ex. R, Daniels Depo., Pgs. 132-133).

Not only was Parsell qualified and desirable, Knox did not advance in the application process because, during his interview, he indicated that he "avoided" Dr. Laura Justice, the Director of SFC, *who would have been one of his primary customers.* (Id., Pg. 144).

> Certainly the conversation around Laura Justice weighed more heavily, but it seemed to me that the nature of the work, he just – it didn't read in the interview as -- as -- **it didn't help my confidence that he could take on the customer challenges that exist in HS. And I do think that this, the final response in sort of [going] around Laura Justice didn't help. It was – it didn't help him either**. (Emphasis added). (Id., Pg. 135).

Knox testified that he has no evidence that his failure to advance was based upon age: "Like I said, in that particular position that you're asking about, I have no idea on whether or not the decision was based on my age." (Knox Depo., Pg. 169).[9]

### H.  Knox Improved His Employment Position Because he Now Earns Significantly More Money and Has the "Best Job" of "His Life."

After leaving OSU, Knox received severance consisting of full pay for four months through the middle of August 2018. (Knox Depo., Pgs. 14-15). In December 2018, he began working for Anheuser-Busch, where he worked for six months as a scheduler planner. (Id.,

---

[9] Based upon contemporaneous communications, it is unclear why Knox applied for so many jobs at OSU because he did not appear to want to return to OSU. For example, while texting with Terry West, a former OSU employee that had since retired, Knox told Terry West: "I am going to enjoy some time off. I have stuff to do at home and it is spring. I will be busy working on projects for a little while." (Ex. S, EEOC03271). Further, in relation to the job posting within EHE (Job Number 445794, discussed above), Knox sent a text message to Bryan Lenzo (who, at that time, was no longer with OSU) after he had interviewed with Adam Daniels for the EHE position: "**Wouldn't go back [to OSU] anyway**. Would have liked to show up for the interview wearing shorts and a Hawaiian shirt." (Emphasis added.)(Ex. S, EEOC03303).

at Pgs. 16, 12-13, respectively).  After Anheuser-Busch, Knox was hired by Dollar Tree as assistant human resources manager for one year, from approximately June 1, 2019 to June 2020.  (Id., Pgs. 10-12).

Knox then left his position at Dollar Tree for his current position of Associate[10] Relations Specialist at Wallick Communities.  (Id., at Pgs. 11, 6, respectively).  Curiously, despite all the allegations of age animus and discrimination made by Knox against Bryan Lenzo (discussed below), Lenzo notified Knox about the position at Wallick Communities, where Lenzo works as Vice President of Human Resources.  Knox admitted that Lenzo sought him out and encouraged Knox to apply for the position.  (Knox Depo., Pgs. 8-10).  Indeed, Lenzo had been assisting Knox in his post-OSU job search, had acted as a reference for Knox, completed an employment related survey, and had alerted him to multiple open jobs.  (Id., at 128-129, 131, 133-134).

> Q. Would you use as a job reference someone who was biased against you because of your age?
>
> A. **In this particular situation – I never said he [Lenzo] was biased against me, against my age.** I repeated that a couple of times. I know, I understand; I'm not agreeing to that. What I am saying is, yes, I would use a job reference of someone of his stature at the university. His level, he was my supervisor. What am I supposed to put on my resume or reference list, well, call Jackie because she's now the boss over there. I did not work for her. **You put on your reference list people that either you've worked for or a good character reference and who definitely support what you're doing.** So, yes, that's why I would use Bryan in that situation.  (Emphasis added).  (Id., at 104-105).

In fact, Lenzo did not help Knox find *just any job*, he helped Knox secure the best job of his life: "**It's the best job I've had in my life . . . I'm so glad he contacted me and offered me this position**."  (Emphasis added).  (Id., at 151).  Indeed, at the time of the RIF, Knox was

---

[10] At Wallick Communities, employees are referred to as "associates." (Knox Depo., Pg. 6).

earning an annual salary of $65,640 per year at OSU.  He is currently earning $75,876.58 in his new position at Wallick working with Bryan Lenzo.  (Ex. T, EEOC 03429).

## I.      Knox Complained Internally to OSU 6 Months After the RIF.

On October 30, 2018, approximately six months after the RIF of his position, Knox submitted a written complaint to the Office of Human Resources ("OHR") requesting an investigation of the abolishment of his position.  In submitting his complaint, Knox attempted to conflate the RIF and the subsequent reclassification of Jennifer Lagnese into a single event, as evidence of age discrimination.  (Ex. U, 10/30/18 email complaint from Knox to OHR).  However, much like Knox's current failure to support his claims of age discrimination, his complaint to OSU had no factual support.   Instead, he baldly claimed that Lagnese's reclassification was "highly unusual" and vaguely alleged that the college had a "history of age discrimination and unethical behavior in the college HR office."  (Id.)

     In response, OSU conducted an investigation which involved, among other things, interviews of Knox, Jackie Chambers, and Bryan Lenzo.  (Ex. V, Case Report issued by Kristi Hoge dated 1/25/19, at Pg. 2 (the "Case Report")).  The investigator, Kristi Hoge, also reviewed documents related to the RIF, the reclassification of Lagnese, and related transaction data for CETE, SFC, and CCEC for 2017 and 2018.  (Id.)  Consistent with the discovery in this case, the Case Report made the following findings (among others): i) Lenzo "brought forward and approved the RIF for Knox . . . ." (Id., at Pg. 6); ii) the RIF was based upon a reorganization for efficiency given the reorganization of CETE (Id., at Pg. 3); iii) Jodi Renshaw absorbed the work that was formerly a part of CETE and Jackie Chambers absorbed the work related to SFC and CCEC (Id., at Pg. 3); iv) "A new Dean of the college [Pope-Davis] arrived and began evaluating the leadership and structure of EHE Human Resources" (Id., at

Pg. 5); and v) Lenzo resigned and was not a part of Lagnese's reclassification (Id., at Pgs. 5, 4, respectively).

The Case Report concluded that there was insufficient evidence to support a claim for age discrimination based upon the following facts:

- The RIF was justified and Knox acknowledged the justification at the time.

- A different leadership team made the decision for the RIF and the decision for the Lagnese job reclassification. Additionally, at the time of the reclassification, there was a decision to decentralize EHE Human Resources and change the generalists to report to the unit directors or chairs.

- Overall Lagnese job is different, from the role Knox held, including project management responsibilities for the EHE Human Resources team. (Id., at Pgs. 5-6).

**J.      Knox Filed His EEOC Charge.**

On January 14, 2019, Knox filed his Charge of Discrimination with the EEOC.  (Ex. W, (the "EEOC Charge")).  Knox signed the EEOC Charge therein declaring, *under the penalty of perjury*, that the allegations were true and correct.  (Id.)  In the EEOC Charge, Knox makes multiple baseless allegations.  The record evidence demonstrates that Knox's allegations are simply untrue, and this Court must question the complete lack of support for the allegations.

For example, the EEOC Charge alleges that "I was told the reasons for my elimination was that there was not enough work to support my position."  Knox ignores, perhaps intentionally, that the Request for RIF of his position explicitly states that the RIF was based upon a "reorganization for efficiency" and the merger of CETE into Ed Studies.  (Ex. K, HR Generalist RIF, Pg. 2).  The EEOC Charge next alleges that "most of my duties were immediately assigned to a much younger (28-year-old), much less experienced HR staff member, Jennifer Lagnese, who previously supported my position."  Again, this allegation is

untrue and wholly contradicted by the record evidence – half of Knox's job duties were absorbed by Jodi Renshaw (age 49) and the other half were absorbed by Jackie Chambers (age 50). Shockingly, Knox admitted during his deposition that Jodi Renshaw took over half of his work and that he did not know what happened with the other half: "I wasn't there, I don't know. That's all." (Knox Depo., Pg. 95). Yet, Knox found it appropriate to declare, under the penalty of perjury, that his duties were "immediately" assigned to Jennifer Lagnese.

Knox's EEOC Charge next alleges that the decision to eliminate him was made by Bryan Lenzo *and* Jackie Chambers. (Ex. W, EEOC Charge). During his deposition, Knox contradicted this statement by admitting that Chambers had no supervisory authority over him (Knox Depo., Pg. 33) and when confronted with this contradiction he vaguely continued to claim that Chambers was somehow involved but, of course, offered no factual support. ("Other than what I have mentioned before, I do feel that she was involved in maybe discussions and she did help prepare documents . . . .")(Knox Depo., Pgs. 83-84).

Knox next alleged that "Mr. Lenzo and Ms. Chambers were deeply involved in actions previously found by the Commission to constitute a pattern of discrimination on the basis of age (in the charges filed by Julianne Taaffe and Kathryn Moon)[11] . . . ." Again, Knox had no

---

[11] The Taaffe/Moon reference is to a prior lawsuit filed by Julianne Taaffe and Kathryn Moon in the U.S. District Court for the Southern District of Ohio, Case No. 2:15-cv-02870, on September 29, 2015, alleging age discrimination in EHE. It was resolved years ago. The individuals involved in the Taaffe/Moon lawsuit were a different class of employees (faculty) and wholly different decision makers were involved. The suit involved allegations of age bias in email communications dating back to 2010 and in personnel actions which took place in 2013 and 2014. The Taaffe/Moon lawsuit is wholly unrelated to Knox's claims and is a proverbial red herring

factual support for this allegation; instead, the allegation was literally based upon newspaper articles and gossip:

> Q. So where did you come up with the idea that both Mr. Lenzo and Ms. Chambers were deeply involved in the actions related to the charges filed by Julianne Taaffe and Kathryn Moon? Is that all from the newspaper?
>
> A: That I can recall. And like I mentioned earlier, probably internal gossip that you pick up on as well.
>
> Q. **So the newspaper and internal gossip; is that correct?**
>
> A. **Correct**.   (Emphasis added.)(Knox Depo., Pgs. 88-89).

Knox next alleged that "others in the College have also been pushed out of their jobs and replaced by younger workers due to their age."  (Ex. W, EEOC Charge).  As par for the course, Knox again had no factual support for this statement made under the penalty of perjury – instead it was based merely on *assumption*:

> Q. I'm talking about the second part of that sentence, the other employees who you referred to as Bing and Neal. You have no personal knowledge about the reasons for their separation from employment; is that correct?
>
> A. Correct, correct. I was not employed by the university at that time. I would not have any internal knowledge of what was going on.
>
> Q. Okay. **So the sentence in this document that we're looking at, Exhibit H, is based upon just an assumption on your part, correct?**
>
> A. **Yes, I would agree with that**. (Emphasis added.)(Knox Depo., Pgs. 89-90).

In total, Knox's EEOC Charge was baseless and wholly lacking any evidentiary or factual support.  As will be discussed further below, the Complaint before this Court suffers from the same lack of factual support as the EEOC Charge and must be dismissed.

## III.   LAW AND ARGUMENT

Plaintiff's Complaint fails and should be dismissed for multiple reasons.  First, Plaintiff cannot demonstrate a *prima facie* case of age discrimination because Knox was not replaced

by someone outside of his protected class or "substantially younger" than him as required

by the Sixth Circuit's interpretation of the ADEA.[12]  Plaintiff similarly cannot demonstrate

that Knox was impermissibly singled-out through the RIF.  Second, even if this Court were to

find that Plaintiff demonstrated a *prima facie* case, Plaintiff cannot demonstrate that age was

the "but-for" cause of the RIF of Knox's position.  Third, Plaintiff cannot demonstrate that

Knox's failures to advance in his attempts to regain employment with OSU were based upon

anything other than legitimate, non-discriminatory business decisions.

### A.    The ADEA, the Shifting Burdens, the *McDonnell Douglas* Test, and *Thompson's* Modification of the *McDonnell Douglas* Framework.

The ADEA prohibits employers from discriminating against individuals in their

employment on the basis of age.  The ADEA provides in relevant part that "[it] shall be

unlawful for an employer . . . to discharge any individual or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To maintain a claim of

age discrimination, a plaintiff must present some credible evidence, either direct or

circumstantial, that age was the but-for cause of his termination.  *Gross v. FBL Fin. Servs. Inc.,*

557 U.S. 167 (2009).

Plaintiff has not provided any direct evidence of age discrimination.  However,

Plaintiff will presumably assert that it can establish a *prima facie* case of age discrimination

under the *McDonnell Douglas* burden-shifting analysis.  *McDonnell Douglas Corp. v. Green,*

411 U.S. 792 (1973).  The Supreme Court held in *Gross* that in an age discrimination case, a

---

[12]   The Sixth Circuit has held that in the absence of direct evidence of discrimination, an age difference of less than six years is not substantial enough to give rise to a prima facie claim. *Grosjean v. First Energy Corp.* 349 F. 3d 332, 340 (6th Cir.  2003).

plaintiff must show that his or her age was the "but-for" cause of the challenged adverse employment action, not just a motivating factor. *Gross,* 557 U.S. at 177–78. Following *Gross,* the Sixth Circuit explained that the *McDonnell Douglas* framework remains useful in analyzing circumstantial evidence in ADEA claims. *See, Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir. 2009). To state a *prima facie* case, a plaintiff must establish that: 1) he was a member of a protected class; 2) he was discharged; 3) he was qualified for the position held; and 4) he was replaced by someone outside of the protected class. *McDonnell Douglas,* 411 U.S. at 802. In the context of a reduction in force, the fourth requirement is modified to require the plaintiff to offer some "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Thompson v. Fresh Products, LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citing *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414 (6th Cir. 1999)).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 804; *see also, Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 394 (6th Cir. 2008). If the employer meets this burden, the burden shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination. *Id.; see also, St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993). The burden of persuasion, however, remains on the ADEA plaintiff at all times to demonstrate "that age was the 'but-for' cause of their employer's adverse action." *Geiger,* 579 F.3d at 620 (quoting *Gross,* 557 U.S. 167, n.4). The Sixth Circuit has held that a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when it is analyzing the plaintiff's *prima facie* case. *See, Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th

Cir. 2003) (en banc). Further, the Sixth Circuit has held that in the context of explaining what establishes a *prima facie* case of age discrimination that the *McDonnell Douglas prima facie* elements are not to be applied "mechanically, instead opting for a case-by-case approach that focuses on whether age was in fact a determining factor in the employment decision." *Barnes v. GenCorp. Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990).  To survive a motion for summary judgment, Plaintiff must show that "there is sufficient evidence to create a genuine dispute at **each stage** of the *McDonnell Douglas* inquiry."  (Bold emphasis added; italic emphasis in original).  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citation omitted).

### B. Plaintiff's Complaint Fails Because it Cannot Demonstrate a *Prima Facie* Case for Age Discrimination Because Knox Was Not Replaced by Someone Outside of His Protected Class.

In applying the *McDonnell Douglas* framework (as modified by *Thompson*) to the current case, it is clear that Plaintiff cannot establish a *prima facie* case for age discrimination related to the RIF of Knox's position.  This is because, after the abolishment of Knox's position, he was not replaced by someone outside of his protected class or someone with a substantial age difference.  Plaintiff further cannot demonstrate that Knox was singled out for an impermissible reason.

OSU does not dispute that Knox is a member of a protected class because he was over 40 years old (he was 53) at the time of the RIF of his position.  OSU also does not dispute that Knox was discharged through the RIF or that he was qualified for the position he held.  This leaves the fourth element – which Knox admits he has no basis to dispute.

The discovery in this case is consistent and it confirmed what OSU originally found when it internally investigated Knox's complaint – that Knox's duties were absorbed by two

existing HR Generalists that were both well over 40 years old – one 49 and the other 50 years old (only a couple of years younger than Knox).   As set forth above, at the time of the RIF of Knox's position, half of his duties consisted of supporting CETE and the other half consisted of supporting SFC and CCEC.   (Knox Depo., Pgs. 28-29, 93-95).  Following the RIF of Knox's position, his duties related to CETE were absorbed by Jodi Renshaw (age 49) and his duties related to SFC and CCEC were absorbed by Jackie Chambers (age 50).  (Id., at Pgs. 93-95).  Knox admitted that Jodi Renshaw was only a couple of years younger than him and assumed that Jackie Chambers was also over 40 (Chambers is, in fact, older that Renshaw).  (Id., at Pgs. 94, 99).

While Knox and the EEOC baldly claimed that Knox's duties related to SFC and CCEC were "immediately" given to Jennifer Lagnese, there is no basis in fact for this allegation. Rather, Jennifer Lagnese continued to support the HR Generalist responsible for SFC and CCEC, Jackie Chambers – *just as she had before for Knox*.  In other words, prior to the RIF, Lagnese was the HR Specialist supporting Knox, as HR Generalist, related to SFC and CCEC. *After the RIF*, Lagnese was the HR Specialist supporting Jackie Chambers, as HR Generalist, related to SFC and CCEC.  (Chambers Depo., Pgs. 94-95, 113-114).  Indeed, Lagnese was not given any new work in SFC or CCEC after Knox's RIF.  (Id., at Pg. 114).  Knox had no basis to dispute this because: "I wasn't there, I don't know. That's all."  (Knox Depo., at Pg. 95).  This division of duties was also confirmed in the Case Report.  (Ex. V, at Pg. 3).

Further, Plaintiff's allegation that Knox was the oldest HR Generalist within EHE at the time of the RIF is insufficient to establish a *prima facie* case of age discrimination.  *See, Almond v. ABB Industrial Sys., Inc.,* 56 Fed. App'x. 672, 675 (6th Cir. 2003) (finding that the fact that the terminated employee was the oldest in his department was insufficient to

establish a *prima facie* case under the ADEA); *see also, Bynum v. Fluor Fernald, Inc.,* No. C-1-04-361, 2006 U.S. Dist. LEXIS 7796, at *20–21 (S.D. Ohio Mar. 1, 2006) (Weber, J.) (finding that plaintiff terminated in a reduction in workforce case could not establish *prima facie* case of age discrimination showing that she was the oldest employee in the group within which she was considered for the reduction in workforce and that younger employees were retained); *Dabrowski v. Warner-Lambert Co.,* 815 F.2d 1076, 1078–79 (6th Cir. 1987) (stating that "[t]his court has long recognized that the mere fact that a younger employee or applicant receives better treatment than an older one is insufficient to carry the burden of proof in a case under the federal Age Discrimination in Employment Act"; holding that the plaintiff employee's evidence showed little more than that employer hired persons younger than the plaintiff).

Because Knox was not replaced by a younger individual, outside of his protected class, nor is there any evidence that OSU singled Knox out impermissibly, Plaintiff cannot demonstrate a *prima facie* case for age discrimination and its Complaint (as it relates to the RIF of Knox's position) should be dismissed.

### C.    The RIF of Knox was Based Upon a Legitimate, Non-Discriminatory Reason

In the alternative, should this Court find that Plaintiff has met its burden of establishing a *prima facie* case, the evidence demonstrates that OSU's RIF of Knox's position was based upon a legitimate non-discriminatory reason – the reorganization and merger of CETE into Ed Studies.

As discussed previously, discussions about the viability of various centers within EHE and whether certain centers would survive were nothing new and had been going on for years.  Bryan Lenzo testified that these discussions had been going on for several years since

at least when he began his position as HR Director within EHE.  (Lenzo Depo., Pg. 62, 46-47).

Given these struggles, OSU hired the Outside Experts, at a cost of $123,143.76, to review EHE,

with particular focus on CETE.  (Ex. E, Program Review Report and related Addendum from

Outside Experts; *see also*, Ex. F, Affidavit of Kristi Hoge (OSU's 30(b)(6) witness)).  As noted

above, the challenges CETE faced were literally existential: "While our assessment is

certainly debatable, **we believe it is quite likely that CETE will cease to exist without**

**implementing changes in vision and operation**."  (Emphasis added.)(Program Review

Report and related Addendum).  Bryan Lenzo, former Dean Achterberg, and Kristi Hoge all

testified about this reality.

OSU then adopted and acted upon the recommendations of the Outside Experts,

began reorganizing EHE, and merged CETE into Ed Studies.  (Achterberg Depo., Pg. 92).  This

reorganization was the explicit reason for the RIF of Knox's position:

> The Center on Education and Training for Employment (CETE) is under an
> [sic] reorganization from recommendations received by a program review.
> This center has been merged with the Department of Educational Studies
> therefore eliminating the need for the above position.  (HR Generalist RIF, at
> Pg. 2).

Despite Knox's blind insistence in the EEOC Charge and Plaintiff's insistence in the

Complaint that Knox's RIF was the product of age discrimination, Knox testified that he was

literally clueless about the Outside Experts and the Program Review Report.  His testimony

even suggests that high-level information, such as this, would never be a part of his world:

"**Why would I be aware of the dean's asking for a study**?"  (Emphasis added)(Knox Depo.,

Pg. 61).

Simply, with no knowledge of the retention of the Outside Experts or the Program

Review Report, Knox and Plaintiff cannot plausibly argue that this was not in fact the basis

for the RIF of Knox's position. Stated differently, in order for Plaintiff's version of the "facts" to be accepted as true, one would need to conclude that the Outside Experts, the Program Review Report, and the merger of CETE into Ed Studies was an elaborate, $123,000 ruse carried out for the sole purpose of discriminating against Knox. This conjecture is simply too far-fetched and speculative to survive summary judgment.

### D. Plaintiff Cannot Demonstrate the Outside Experts, the Program Review Report, and the Merger of CETE into Ed Studies Was Simply a Pretext for Age Discrimination Against Knox.

OSU anticipates that Plaintiff will argue that the stated reasons for Knox's RIF were merely a pretext for age discrimination against Knox. OSU accordingly addresses these issues, although, for the reasons set forth above, the Court's inquiry need not proceed this far. As above, Plaintiff cannot demonstrate that the Outside Experts, the Program Review Report, *and* the merger of CETE into ED Studies was just a pretext to remove Knox.

To establish that an employer's legitimate, nondiscriminatory reason for an adverse employment action is pretextual, a plaintiff may show that: "(1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his [termination], or (3) they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009) (quoting *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir. 1993)). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently cause [the] employer to take the action it did) are not true.'" *Smith v. Chrysler Corp.,* 155 F.3d 799, 805–06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 676 (7th Cir. 1997)). "[A] reason cannot be pretext for discrimination unless it is shown both that the reason was false, and

that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)).

Irrespective of the method a plaintiff uses to rebut a defendant's reasons, the plaintiff "always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant intentionally discriminated against h[er]." *Id.* (quoting *Clark v. Walgreen Co.,* 424 F. App'x 467, 474 (6th Cir. 2011) (internal quotations omitted and alterations in original). When assessing the evidence provided by the parties, the Court is to be mindful that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Parkhurst v. Am. Healthways Servs., LLC,* 700 F. App'x 445, 449 (6th Cir. 2017) (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009)) (alteration in original and internal quotations omitted).

Given the facts outlined above, Plaintiff cannot demonstrate that Outside Experts, the Program Review Report, *and* the merger of CETE into ED Studies was just a pretext to remove Knox. There are an overabundance of facts supporting the actions OSU took leading up to and including the RIF of Knox's position. The facts, simply, do not support a finding of pretext here to overcome summary judgment. Indeed, the U.S. Court of Appeals for the Sixth Circuit has repeatedly recognized the consolidation of job duties as a legitimate, nondiscriminatory reason to terminate an employee. *See, e.g., McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 469, 482–83 (6th Cir. 2014); *Geiger*, 579 F.3d at 626; *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). This is true even when the person who loses his or her job had a positive performance record. *See, Jones v. SKF USA, Inc.*, 77 F. App'x 866, 868 (6th Cir. 2003) (citing *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1129 (6th Cir. 1998)).

Moreover, it cannot be ignored that the crux of Plaintiff's Complaint – that Bryan Lenzo, former Dean Achterberg, and Jackie Chambers discriminated against Knox – is factually false and, frankly, nonsensical.  Discovery in this case confirmed that Bryan Lenzo was the sole decision maker for the RIF of Knox's position.  (Ex. K, HR Generalist RIF; Ex. C, Lenzo Depo., Pg. 157 (Lenzo was the sole decision maker)); (Knox Depo., Pg. 33 (Chambers had no supervisory authority over Knox)).  In any event, each of these individuals testified that they had never been accused of discrimination (before this case).  (Lenzo Depo., Pg. 29; Achterberg Depo., Pg. 17; Chambers Depo., Pg. 19).  Knox also testified that he had limited interactions with Dean Achterberg and more often interacted with her assistants.  (Knox Depo., Pgs. 33-34).

Perhaps most damaging to Plaintiff's claims is the fact that Lenzo not only did *not* discriminate against Knox, but he actively helped Knox with his job search (Knox Depo., Pgs. 8-10, 128-129, 131, 133-134) and actively recruited Knox at Lenzo's own employer to land the "best job" of Knox's life.  (Id., Pg. 151).  Knox even admitted that he did not think that Lenzo was biased against his age:

> Q. Would you use as a job reference someone who was biased against you because of your age?
>
> A. **In this particular situation – I never said he [Lenzo] was biased against me, against my age . . . .** (Emphasis added).  (Id., at 104).

If Lenzo was so intent on discriminating against Knox because of his age, *why would Lenzo actively seek out Knox to get him to apply for a position at Wallick Communities where Knox would be working beneath Lenzo*?  If Lenzo was truly biased against older employees, he would have no interest in adding Knox to his human resources team.

Collectively, there is no evidence that the Outside Experts, the Program Review Report, and the merger of CETE into Ed Studies were pretexts for age discrimination against Knox.   To the contrary, the evidence demonstrates that Lenzo was anything but discriminatory against Knox; Lenzo appears to have been looking out for Knox's best interests:

> It [RIF'ing Knox's position] absolutely broke my heart. And it is a moment that I thought about for years. And I thought -- I had a lot of respect for Al. I thought he was really good at a lot of things. In fact, when I started the job where I'm at now, which is Wallick Communities -- I'm the vice president of human resources there. He's the first person I thought of and hired him. And Al actually resigned from another job to come work for me again, where he's been working for me for the last year and a half. And he's doing a tremendous job. So I love the guy. And this was – this was very hard. But it [Knox's RIF] had nothing to do with his age.  (Lenzo Depo., Pg. 98).

Because there is not a scintilla of evidence of pretext here, Plaintiff's Complaint must be dismissed.

### E.    The Reclassification of Jennifer Lagnese to HR Generalist Was Not a Product of Age Discrimination.

Plaintiff's Complaint next alleges, albeit erroneously, that Jennifer Lagnese's promotion to HR Generalist, six months after the RIF of Knox's position, was also evidence of age discrimination.  (Complaint, ECF #1, ¶7.g).  Plaintiff's claims are false as demonstrated by the following uncontroverted facts: i) completely different decision makers were involved in the decision to reclassify Lagnese's position (Lenzo had no involvement); ii) Lagnese was reclassified to HR Generalist following a cascade of organizational and employee changes at EHE, including a new dean and Jackie Chambers being appointed and promoted to Interim Co-Director of HR within EHE; and iii) the position Lagnese assumed was not the same or similar to the position that Knox left.

First, as noted above, Lenzo no longer had decision making authority at OSU.  Rather, the decision makers for the reclassification/promotion of Lagnese were new Dean Pope-Davis, Jackie Chambers, and Adam Daniels – none of whom were decision makers for the RIF of Knox's position.  (Chambers Depo., Pg. 127).  Dean Pope-Davis was not even employed by the College at the time of the RIF.  Knox also testified that he had no reason to believe that Dean Pope-Davis was biased against older employees and he had no evidence of age-based hostility by Jackie Chambers:

> Q. Do you have any reason to believe that Dean Pope-Davis is biased against older workers?
>
> A. I would have no knowledge of that, no.  (Knox Depo., Pg. 99).
>
> **** 
>
> Q. And then how about any examples of age-based hostility that were condoned by Jackie Chambers?
>
> A. Once again, I wasn't party to all her conversations. I really wouldn't know. (Id., at Pg. 110).

Second, Lagnese's reclassification to HR Generalist was based upon multiple organizational and employee changes within EHE.  Approximately two months after the RIF of Knox's position, Dr. Achterberg, Dean of EHE, retired on June 30, 2018 due to multiple family health issues.   (Achterberg Depo., Pgs. 84 and 146, respectively).   Next, Dr. Achterberg's position was filled by a new dean – Dr. Don Pope-Davis who sought to decentralize HR within EHE.  (Hoge Personal Depo., Pg. 146).  Bryan Lenzo then left the position of HR Director within EHE and eventually resigned for another position outside of OSU.  Bryan Lenzo's role was filled by two existing HR Generalists within EHE, Adam Daniels and Jackie Chambers.  (Chambers Depo., Pg. 127; Daniels Depo., Pg. 22).  Once Jackie Chambers was promoted to Interim Co-Director of HR (along with Adam Daniels), she could

no longer handle the volume of HR support she previously handled as HR Generalist. (Chambers Depo., Pg. 127). Dean Pope-Davis decided to not consider an outside hire for the Chambers' newly-vacant HR Generalist position but, instead, "the work need[ed] to be distributed among [the] existing staff." (Hoge Personal Depo., Pg. 150). There was also a resignation and a medical leave that impacted workload at the time of Lagnese's reclassification. (Id., Pgs. 51-52). Collectively, there were five significant organizational changes (months after Knox's RIF) within EHE that brought about the reclassification of Lagnese.

Third, the position to which Lagnese was reclassified was not the same position that Knox previously held. The position that Knox held supported CETE, SFC, and CCEC. The position that Lagnese assumed covered only SFC and CCEC. (Chambers Depo., Pg. 127; Case Report, Pg. 4)("The reclassification of her position was to support SFC and CCEC as well as being responsible for Project Management for the HR Team."). This additional role of project management was a specific skill set that Lagnese brought to OSU from her prior employers and work she conducted in her role as Senior HR Specialist. (Lagnese Depo., Pgs. 21, 34-35) ("They also had me focus on HR project management.").

Lagnese's role as HR Generalist was also different than Knox's role because Lagnese's role reported directly to Dr. Laura Justice, Director of SFC, rather than the Interim Co-Directors of HR within EHE. (Ex. N, 10/15/18 Notice regarding reclassification)("Your supervisor will be Dr. Laura Justice."). This direct reporting by an HR Generalist to their internal client was based upon new Dean Pope-Davis's reimagination of HR within EHE. (Hoge Personal Depo., Pg. 144) ("This new leader, Dean Pope-Davis was the dean who was, you know, obviously looking at kind of decentralizing that HR structure. And – and it's a

different reorganization strategy than what Bryan had . . . .").  Simply put, the position that Lagnese eventually assumed was not even arguably the same position that Knox left.  (Id., Pgs. 87).

The facts of this case are *nearly identical* to those in *Drews v. Berrien County, Michigan*, 839 Fed. Appx. 1010 (6ᵗʰ Cir., Jan. 15, 2021), where the Sixth Circuit recently affirmed the District Court's grant of summary judgment in favor of the defendant employer.  In *Drews*, plaintiff was employed for many years by the Berrien County Road Commission as a payroll specialist.  The Road Commission, which managed local road maintenance, was an independent municipal entity, separate from the Berrien County government.  "In 2012, the Michigan Legislature gave county governments the option to dissolve their local road commissions" in favor of the county governments handling these responsibilities and the related financial costs.  The Berrien County Board of Commissioners then completed a feasibility study which led to the Berrien County Road Commission being absorbed.  The local county government had its own payroll staff, so plaintiff's position was eliminated; at the time she was 57 years old.

The similarities between *Drews* and the instant case are striking: i) a feasibility study was completed and updated in the years leading up to the consolidation and the study supported the consolidation; ii) the County determined that its existing payroll staff could handle all of the work that plaintiff previously performed; iii) plaintiff's duties did not go away, they were absorbed by existing employees; iv) plaintiff was the only employee that lost her job; v) after plaintiff's termination, an employee named Nichols "shouldered many, though not all, of Drews' former responsibilities" (Id.); vi) after plaintiff's termination the managing director of the road department was replaced; vii) less than a year later, two new

payroll employees were hired by the road department; viii) the new director "altered the allocation of responsibilities among the Road Department staff, eventually making these two hires necessary" (Id. at *1013); ix) after the hiring of the two new payroll employees, Nichols continued to handle duties previously performed by plaintiff.  Based upon all of these nearly identical facts, the *Drews* Court found, among other things, that i) "the County acted on its reasonable understanding that Drews' position was redundant at the time it terminated her"; and ii) "[t]his record would not allow a reasonable jury to conclude that a consolidation did not occur or that the County's justification for the consolidation was pretextual."  (Id.)

Each of these nine factors also occurred at OSU related to Knox's RIF: i) OSU commissioned the Outside Experts that issued the Program Review Report recommending the reorganization of CETE; ii) OSU adopted those recommendations and determined that Knox's duties supporting CETE, SFC, and CCEC could be handled by existing HR Generalists, Jodi Renshaw and Jackie Chambers; iii) the duties previously performed by Knox did not go away, they were absorbed by Renshaw and Chambers; iv) Knox was the only human resources employee who lost his job; v) after Knox's termination, Renshaw shouldered many but not all of Knox's duties (Renshaw absorbed half of his duties – which was supporting CETE); vi) after Knox's termination, the Dean of EHE, Dr. Cheryl Achterberg, resigned and a new dean, Dr. Don Pope-Davis, was appointed *and* the Director of HR within EHE resigned; vii) more than 6 months after Knox's RIF, Lagnese was reclassified as an HR Generalist; viii) changes brought about by the new dean, including the promotion of Chambers and Daniels to Interim Co-Directors of HR within EHE, among others (an HR Generalist taking medical leave and another resigning) prompted Lagnese's lateral reclassification; and ix) after Lagnese's lateral reclassification, Renshaw continued to perform a significant portion of

36

Knox's old duties – as HR Generalist supporting CETE, which had since merged into Ed Studies.  These facts should produce no other result than the result reached in *Drews* – a grant of summary judgment in favor of OSU.

For the above reasons, the evidence demonstrates that Lagnese's reclassification/promotion to HR Generalist was motivated by age discrimination and the role she assumed was not the role that Knox left.  Therefore, Plaintiff's Complaint should be dismissed.

**F.     There is No Direct Evidence of Age Animus Related to Knox by Decision Makers at EHE.**

In an attempt to gin up some sort of direct "evidence" of age discrimination related to Knox, Plaintiff in its Complaint claims that Knox and Renshaw were referred to by Lenzo in age discriminatory terms such as "old guy," "old girl" and collectively as the "old crew." (Complaint, ECF #1, ¶ 7.h.i).  Of course, any alleged age-bias of Lenzo is completely dispelled upon Lenzo searching out Knox (the old guy) in order to offer Knox a job at Lenzo's place of employment following his resignation at OSU.  Although Lenzo denies using those terms, even if he had used them, such statements do not, in and of themselves, demonstrate age bias.  It is undisputed that both Knox and Renshaw were the longest-serving members of the human resources team at EHE.  The Sixth Circuit recently examined a very similar case and held that referring to an older employee as having a "limited shelf life" and reaching her "expiration date" was not direct evidence of age discrimination and was insufficient to create a question of fact on summary judgment.  *Pelcha v. MW Bancorp.,* 988 F. 3d 318, 325-26 (6th Cir. 2021).  The Court held that simply referring to an employee's length of service or nearing retirement "can refer to how long an employee has spent at a company, not simply their age" and is not sufficient to demonstrate age discrimination.  Id. at 325 (citing *Scott v. Potter*, 182

F. App'x 521, 526 (6th Cir. 2006) (Discussing that "years of service" is a concept distinct from "age."))

For his part, Knox, himself, *admits that he may have referred to himself* as the "old guy on the team."  (Knox depo., Pg. 109).  This is confirmed by Adam Daniels, who testified that Knox frequently referred to himself at the "old guy."  (Daniels Depo., Pgs. 94-95). Any alleged references to Knox as the old guy or Knox and Renshaw together as the old crew are another of the many non sequiturs in this case which do nothing to establish Plaintiff's claims of discrimination.

> **G.** **There Is No Evidence of Age Animus Related to Knox's Attempts to be Hired for a New Job at OSU.**

Beyond the RIF that resulted in Knox's separation from OSU, Plaintiff also alleges that OSU discriminated against him because he failed to advance in his 8 applications for positions at OSU.  As noted above, given Plaintiff's statement that it is no longer pursuing a failure to re-hire claim for 7 of the 8 positions, OSU will only address the remaining position at issue – the HR Generalist position within EHE.  OSU reserves the right to further brief this issue should Plaintiff fail to formally withdraw its claim related to the other 7 positions.

Plaintiff's claim related to the sole position within EHE for which Knox applied fails because: i) Knox admitted that he has no evidence that his failure to advance was based upon age discrimination or that the sole-decision maker, Adam Daniels, was age-biased; and ii) this position was filled based upon legitimate, non-discriminatory rationale.  The alleged failure to hire on the basis of age discrimination is analyzed under the same *McDonnel Douglas* framework.  *See*, *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (relying on *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

First, during Knox's deposition, he admitted that he has no evidence that his failure to advance in the HR Generalist position within EHE (Position 445794) was based upon age discrimination or age bias.  (Knox Depo., Pg. 169) ("Like I said, in that particular position that you're asking about, I have no idea on whether or not the decision was based on my age."). Knox also admitted that he did not know the successful candidate, Teri Parsell (Knox Depo., Pg. 166.), so it is unclear how he can credibly question her qualifications for the position. There is, further, no evidence that the rationale for hiring Ms. Parsell was a pretext for unlawful discrimination.  Ms. Parsell was selected for the role because she had extensive experience working with faculty (unlike Knox), a complete grasp of the HR transaction universe at OSU and was a leader in terms of implementation of new technology. (Ex. Q, OSU's Responses to Plf's First Interrogatories, Pg. 5). Additionally, Ms. Parsell's interview responses and experience made her best suited to deal with a difficult customer group of faculty and to be better suited to deal with potential conflict situations. *Id.*

Second, it was clear from Knox's telephone interview for this position with Adam Daniels that, unlike Ms. Parsell, Knox appeared unwilling or unable to deal with a "difficult customer group," and who would be his main customer/client, Laura Justice, with whom Knox had previously worked and did not have successful results.  Indeed, Daniels testified that he did not have confidence Knox could succeed given that Dr. Justice would have been one of the positions most important internal clients.  (Daniels Depo., Pgs. 144, 135) (Knox said that when he previously worked with Dr. Justice, *he just avoided her*, which was not going to be an option with this position).  The evidence clearly demonstrates that OSU had legitimate, non-discriminatory reasons for each of this hiring decision and that there exists no evidence of pretext.

Moreover, Plaintiff's allegations that Knox was qualified and/or more qualified than other candidates is insufficient to state a *prima facie* claim of discrimination.  "As a matter of law, a Title VII plaintiff's contention that he was better qualified than the workers who were retained, is insufficient to establish a *prima facie* case.  It is the employer's motivation that is the key factor, not the employee's perception." *Mitchom v. HCA Mgmt. Serv., L.P.,* No. 3:08-1224, 2009 U.S. Dist. LEXIS 107353 (M.D. Tenn. Nov. 17, 2009) (finding that a plaintiff's contention that layoffs should have been based on seniority and experience insufficient to support a *prima facie* case of discrimination); *Browning v. Dep't of the Army,* 436 F.3d 692, 698 (6th Cir. 2006) ("Whether Browning agrees with Courtney's scoring method, or whether he believes that he was more qualified for the position that Rhodus ultimately filled, is irrelevant to the age-discrimination inquiry-what matters is Courtney's perception of Browning's qualifications.").  As noted above, Knox has no evidence to demonstrate that his lack of success with this job application (or the other 7 positions for which he applied) was age-based.

Finally, it bears repeating that just because a candidate is qualified does not mean they are the most suitable candidate for the position.  Plaintiff has failed to demonstrate that age played any role in this hiring decision or that this decision was not based upon legitimate, non-discriminatory reasons.  Accordingly, Plaintiff's failure-to-hire claims must also be dismissed.

## IV.     RELIEF REQUESTED

For the reasons set forth above, OSU's Motion for Summary Judgment should be granted in its entirety, Plaintiff's Complaint should be dismissed with prejudice, and the

Court should award all other relief deemed appropriate under the circumstances.

**Dave Yost**
**Ohio Attorney General**

/s/ Christina L. Corl
CHRISTINA L. CORL (0067869)
Plunkett Cooney
300 East Broad Street, Suite 590
Columbus, Ohio 43215
Telephone: (614) 629-3018
Facsimile: (614) 629-3019
ccorl@plunkettcooney.com
*Counsel for Defendant, The Ohio State University*

## CERTIFICATE OF SERVICE

Please take notice that counsel hereby certifies that the foregoing document was electronically filed/transmitted with the Clerk's Office using its electronic filing system on this 21st day of January, 2022, which will notify all parties of record via electronic mail.

/s/ Christina L. Corl
Christina L. Corl

Open.25577.90605.27909207-1

41